# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW MEXICO

**ANGIE DURAN,**
**on behalf of A.M.D., a minor,**

   **Plaintiff,**

**v.**              **Civ. No. 18-50 KK**

**NANCY A. BERRYHILL,**
**Acting Commissioner of the**
**Social Security Administration,**

   **Defendant.**

## <u>MEMORANDUM OPINION AND ORDER[1]</u>

  **THIS MATTER** is before the Court on the Social Security Administrative Record (Doc. 15) filed May 1, 2018, in support of Plaintiff Angie Duran's ("Plaintiff") Complaint (Doc. 1) seeking review of the decision of Defendant Nancy A. Berryhill, Acting Commissioner of the Social Security Administration, ("Defendant" or "Commissioner") denying Plaintiff's claim for Title XVI supplemental security income benefits on behalf of A.M.D.  On July 27, 2018, Plaintiff filed her Motion to Reverse and Remand For Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum ("Motion").  (Doc. 21.)  The Commissioner filed a Response in opposition on September 10, 2018 (Doc. 23), and Plaintiff filed a Reply on October 10, 2018.  (Doc. 24.)  The Court has jurisdiction to review the Commissioner's final decision under 42 U.S.C. §§ 405(g) and 1383(c).  Having meticulously reviewed the entire record and the applicable law and being fully advised in the premises, the Court finds the Motion is not well taken and is **DENIED.**

---

[1] Pursuant to 28 U.S.C. § 636(c), the parties consented to the undersigned to conduct any or all proceedings, and to enter an order of judgment, in this case.  (Docs. 4, 8, 9.)

# I.  Background and Procedural Record

Plaintiff Angie Duran's daughter, A.M.D. ("A.M.D."), was born on May 11, 2003, and was, therefore, at all relevant times a school-age child.  (Tr. 14, 178.)  On July 21, 2014, Plaintiff protectively filed an application on A.M.D.'s behalf for Supplemental Security Income (SSI) benefits under Title XVI of the Social Security Act, 42 U.S.C. Section 1381 through 1381c, claiming that A.M.D. was disabled as of July 14, 2014, at the age of eleven, because of ADHD, oppositional defiant disorder, obsessive compulsive disorder, depression and anxiety.  (Tr. 68, 178-83.)  Plaintiff's application was denied at the initial level (Tr. 68, 69-78, 93-96), and at reconsideration.  (Tr. 79, 80-92, 101-04.)  On May 22, 2015, Plaintiff requested a hearing before an Administrative Law Judge.  (Tr. 105-07.)  On November 11, 2016, Administrative Law Judge James Linehan held a hearing.  (Tr. 42-67.)  Plaintiff and A.M.D. appeared in person at the hearing with attorney representative Michelle Baca.[2]  (*Id.*)  The ALJ took testimony from A.M.D. (Tr. 45-57), and from Plaintiff (Tr. 58-66).  In a written decision issued on January 12, 2017, the ALJ found that A.M.D. was not "disabled" as that term is defined in the Social Security Act.  (Tr. 8-29.)  On November 28, 2017, the Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the final decision of the Commissioner of the Social Security Administration (Defendant).  (Tr. 1-6.)  Plaintiff timely filed a complaint seeking judicial review of the Commissioner's final decision.  (Doc. 1.)

# II.  Applicable Law

## A.  Standard of Review

The Court reviews the Commissioner's decision to determine whether the ALJ's decision is free from legal error and supported by substantial evidence.  42 U.S.C. § 405(g); *Fischer-Ross*

---

[2] Plaintiff is represented in these proceedings by Attorney Francesca J. MacDowell.  (Doc. 1.)

*v. Barnhart*, 431 F.3d 729, 731 (10ᵗʰ Cir. 2005); *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004). A decision is based on substantial evidence where it is supported by "relevant evidence [that] a reasonable mind might accept as adequate to support a conclusion." *Langley*, 373 F.3d at 1118. A decision "is not based on substantial evidence if it is overwhelmed by other evidence in the record[,]" *Langley,* 373 F.3d at 1118, or if it "constitutes mere conclusion." *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992). Therefore, although an ALJ is not required to discuss every piece of evidence, "the record must demonstrate that the ALJ considered all of the evidence," and "the [ALJ's] reasons for finding a claimant not disabled" must be "articulated with sufficient particularity." *Clifton v. Chater*, 79 F.3d 1007, 1009-10 (10th Cir. 1996). Further, the decision must "provide this court with a sufficient basis to determine that appropriate legal principles have been followed." *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005). In undertaking its review, the Court may not "reweigh the evidence" or substitute its judgment for that of the agency. *Langley*, 373 F.3d at 1118.

**B.    Standards Governing Childhood Disability Determination**

A child under the age of eighteen is considered "disabled" if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which . . . has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(C)(i). The Social Security Administration follows a three-step inquiry to determine whether a child is disabled. 20 C.F.R. § 416.924(a).

At step one, the ALJ must determine whether the child is engaged in "substantial gainful activity." 20 C.F.R. § 416.924(b). If the child is not engaged in substantial gainful activity, the ALJ proceeds to step two. *Id.* At step two, the ALJ must determine whether the child has one or more "severe" "medically determinable impairment(s)." 20 C.F.R. § 416.924(a), (c). If so, the

ALJ proceeds to the next step. *Id.* At step three, the ALJ must determine whether the child's impairments meet, medically equal, or *functionally equal* the Listings of Impairments contained in 20 C.F.R pt. 404, subpt. P., App. 1. 20 C.F.R. § 416.924(d); *Knight ex rel. P.K. v. Colvin*, 756 F.3d 1171, 1175 (10th Cir. 2014.).

To "functionally equal" a listed impairment, the child must have an impairment that results in "marked" limitations in two domains of functioning or an "extreme" limitation in one domain. 20 C.F.R. § 416.926a(a). The relevant domains of functioning are: (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for yourself, and (6) health and physical well-being. 20 C.F.R. § 416.926a(b). In examining functional equivalence, the ALJ must "assess the interactive and cumulative effects of all of the [child's] impairments" including those that are not "severe" to determine how the impairments affect the child's activities—meaning everything she does at home, at school, and in the community. 20 C.F.R. § 416.926a(a), (b). The ALJ must consider how appropriately, effectively, and independently the child performs her activities as compared with children of the same age who do not have impairments. 20 C.F.R. § 416.926a(b).

The ALJ will determine that a child has a "marked" limitation in a domain when her "impairment(s) interferes seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 416.925a(e)(2)(i).

> Marked limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

*Id.* The ALJ will find that a child has an "extreme" limitation in a domain when her "impairment(s) interferes very seriously with [her] ability to independently initiate, sustain, or complete activities." 20 C.F.R. § 417.926a(e)(3)(i).

4

"Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

*Id.*

Standardized test scores are a factor that an ALJ considers in determining a child's limitations in the relevant domains of functioning. However, "[n]o single piece of information taken in isolation can establish whether" the child's limitations in a particular domain are marked or extreme. 20 C.F.R. § 416.926a(e)(4)(i). The ALJ will consider test scores together with the other information about a child's functioning, including "reports of classroom performance and the observations of school personnel and others." 20 C.F.R. § 416.926a(e)(4)(ii). As an example, a child may have IQ scores that are higher than two or three standard deviations below average, but if other evidence in the record shows that an impairment causes her to function in school, at home, and in the community far below her expected level of functioning, her impairment may be "marked" or "extreme" despite her IQ score. 20 C.F.R. § 416.926a(e)(4)(ii)(A). Further, as a general rule, the ALJ should not rely on a test score as a measurement of the child's functioning within a domain when the record contains other information about the child's functioning that is typically used by medical professionals to measure day-to-day functioning. 20 C.F.R. § 416.926a(e)(4)(iii)(B).

## III.  Analysis

The ALJ made his decision that A.M.D. was not disabled at step three of the sequential evaluation. (Tr. 15-29.) Specifically, the ALJ determined that A.M.D. had not engaged in substantial gainful activity since July 21, 2014, the application date. (Tr. 14.) He found that A.M.D. had severe impairments of attention deficit/hyperactivity disorder (ADHD), oppositional

defiant disorder (ODD), and learning disorder.  (*Id.*)  The ALJ determined, however, that A.M.D.'s impairments did not meet or equal in severity one the listings described in Appendix 1 of the regulations.  (Tr. 15.)  As a result, the ALJ proceeded to step three and found that A.M.D. did not have an impairment or combination of impairments that functionally equals the severity of the listings.  (Tr. 16-29.)  Specifically, the ALJ determined that A.M.D. had a marked limitation in acquiring and using information, a less than marked limitation in attending and completing tasks, a less than marked limitation in interacting and relating with others, no limitation in moving about and manipulating objects, no limitation in caring for herself, and no limitation in health and physical well-being.  (*Id.*)

On appeal, Plaintiff argues that the ALJ (1) erred in his determination that A.M.D. had only one area of marked limitation and, in doing so, failed to properly weigh the teacher questionnaires and the results of the July 2014 neuropsychological evaluation which support marked limitations in the areas of attending and completing tasks, interacting and relating with others, and health and physical wellbeing; (2) improperly weighed Plaintiff's testimony; and (3) failed to consider the "whole child" and compare A.M.D. to non-disabled children.  (Doc. 21 at 5-20.)  For the reasons discussed below, the Court finds there is no reversible error.

A.    **Relevant Evidence**

1.    **UNM Health Sciences Center – Neuropsychological Evaluation Report**

On July 14, 2014, A.M.D. presented to UNM Health Sciences Center on a referral from Patricia Engleman, CFNP, for a neuropsychological examination to assess her current level of functioning, to assist in differential diagnosis, and to make treatment recommendations.  (Tr. 349-67.)  Plaintiff explained to evaluator Elena Bettoli Vaughan, Ph.D., that A.M.D. exhibited a variety of impulsive, disruptive and emotional behaviors, including, *inter alia*, stealing, arguing, lying,

fidgeting, and hoarding.  (Tr. 349-50.)  Plaintiff also reported that A.M.D. was easily distracted, interrupted others while talking, rushed through her schoolwork resulting in careless errors, and always struggled with reading, spelling and math.  (*Id.*)  Dr. Vaughan administered several standardized tests, including the Wechsler Intelligence Scale for Children – Fourth Edition (WISC-IV); Woodcock Johnson III (WJ-III) Tests of Achievement: Letter-Word Identification, Reading Fluency, Calculation, Math Fluency, Spelling, Passage Comprehension, and Word Attack subtests; and Comprehensive Test of Phonological Processing-Second Edition (CTOPP-2).  (Tr. 352-66.) Dr. Vaughan also reviewed rating forms completed by Plaintiff and A.M.D.; *i.e.,* the Behavior Assessment System for Children; Conners' 3 Parent Rating Scale; Children's Depression Inventory-Second Edition; and Multidimensional Anxiety Scale for Children.  (*Id.*)  Based on test scores and the rating forms,  Dr. Vaughan's summary and impressions were as follows:

> Current tests results indicated overall verbal and nonverbal intellectual abilities were average.  Auditory working memory was average.  Sustained attention was variable but characterized by impulsive responding.  Processing speed was variable, ranging from low average to high average.  Verbal and visual learning and memory were intact.  Complex language skills were average.  Visuospatial processing was average to high average; however, visuomotor integration was mild impaired. Relative to same grade peers, academic skills in reading, writing, and math were below expectations and indicated that [A.M.D.] would not be able to keep up with her peers without support.  In particular, [A.M.D.] demonstrated mild to moderate impairments in math.   She also demonstrated impairments in phonological processing and rapid naming, despite intact language skills, suggestive of dyslexia. Thus, based on a clinical history of significant difficulties learning to read and based on current test results, indicating impaired phonological processing and rapid naming, [A.M.D.'s] academic difficulties are consistent with the diagnosis of dyslexia or Specific Learning Disorder, with impairment in reading.  Additionally, based on current tests results indicating mild to moderate impairments in math and based on observations of an impaired number sense, a diagnosis of Specific Learning Disorder, with impairment in mathematics, is also warranted.

> [A.M.D.] has a history of inattentive and impulsive behaviors; based on parent report, parent behavior ratings indicating significant difficulties with ADHD, behavioral observations of impulsivity and inattention, and based on current test results, [A.M.D.] demonstrates behaviors consistent with ADHD, combined presentation.  Additionally, based on a history of oppositional behaviors, parent

report, self-report, and parent ratings suggesting significant oppositional behavior, a diagnosis of Oppositional Defiant Disorder was given. Lastly, a diagnosis of Hoarding Disorder was warranted based upon clinical history, parent and self-report, and elevated anxiety scales from parent and self-report rating forms.

(Tr. 355-56.) Dr. Vaughan recommended A.M.D. receive special education services, seek a neurology consult for potential sleep disorder and/or seizure activity, participate in counseling to address her emotional and behavioral difficulties, and consult with a child psychiatrist to determine whether psychopharmacological intervention would be helpful. (Tr. 356-59.)

## 2. Individualized Education Programs

Individualized Education Programs ("IEPs") were prepared on A.M.D.'s behalf on July 31, 2014, May 15, 2015, and March 17, 2016. (Tr. 228-29, 259-68, 298-311.)

On May 15, 2015, the IEP academic summary related to A.M.D.'s special education services in math indicated that A.M.D. was a "very nice young woman who is extremely smart. She picks up and learns new math concepts quickly and is willing to help other students with their work when the class is working in pairs." (Tr. 260.) As for social work services, the IEP summarized that "[s]tudent participates in group, she is expressive about her situation and challenges with peers at school. Peer interactions are challenging for the student. Support for the student continues to be needed to help cope and make positive decisions." (Id.) As for A.M.D.'s general education classes, her social studies teacher indicated that A.M.D. "interact[s] positively with the other kids. She will probably end up with a C, and she is pleasant and answers questions when asked"; her science teacher indicated that A.M.D. currently had a 74.5% in Earth Science, and that she was "cooperative and polite and enjoys the social aspects of school"; her language arts teacher reported that A.M.D. was not completing her work and was currently receiving an "F"; her music teacher reported that A.M.D. was passing with C- and that she was very social and outgoing; and her P.E. coach said that A.M.D. was doing well and that her grade was an A. (Tr.

261.)  The IEP indicated that A.M.D. would continue to require social work services and specialized instruction in math.  (Tr. 265.)  She also needed certain accommodations in general education classes including frequent feedback, short distinctive directions, repeat/rephrase/simplification of directions/instructions, and checking for understanding of instructional words.  (Tr. 264.)

On March 17, 2017, the IEP academic summary related to A.M.D.'s special education services in math indicated that she was "doing really great in class," and was learning the curriculum quickly and moving forward.  (Tr. 300.)  As for her social work services, the IEP summarized that, *inter alia*, A.M.D. had been working in a social skills group to help her communicate her needs, wants, and feelings in a positive manner.  (*Id.*)  Her social worker reported that A.M.D. "is a bright individual who is a good role model to other students.  She is always respectful."  (Tr. 301.)  As for A.M.D.'s general education classes, her social studies teacher reported A.M.D. was an "awesome student," participated regularly, and worked better independently; her language arts teacher reported A.M.D. was an "awesome student – very kind, quiet and hardworking," and that she flourished when allowed to show her artistic and creative side, but "focuse[d] on any work given to her" and was "bright, respectful, and generous helping out others often"; her American Studies teacher reported that A.M.D. was "a positive and interested student," an "avid reader who often share[d] her independent studies," and although she sometimes loses focus, she was never disruptive or distracting; and her science teacher reported that A.M.D. was "very focused and driven to do well in class," and that she consistently turned in completed work without the need for extended deadlines.  (Tr. 301.)  The IEP indicated that A.M.D. would continue to require social work services and specialized instruction in math.  (Tr. 307.)  She also needed certain accommodations including extra time for assignments, clearly

defined limits, re-direction to task, seated near the instructor, visual aids, short distinctive directions, and repeat/rephrase/simplify directions/instructions.  (Tr. 305.)

### 3.  Teacher Questionnaires

Jeanne Pahls, A.M.D.'s Special Education Case Manager, completed two Teacher Questionnaires in 2015 regarding A.M.D.'s functioning in the six domain areas.[3]

#### a.  January 15, 2015 Teacher Questionnaire

##### (1)  Attending and Completing Tasks

In the area of attending and completing tasks, Ms. Pahls rated A.M.D. as having *no problems* in the areas of (1) paying attention when spoken to directly; (2) sustaining attention during play/sports activities; (3)  focusing long enough to finish assigned activity or task; (4) refocusing to task when necessary; (5) carrying out single-step instructions; (6) waiting to take turns; (7) changing from one activity to another without being disruptive; (8) organizing own things or school materials; (9) completing work accurately without careless mistakes; and (10) working without distracting self or others.  (Tr. 221.)  She rated A.M.D. as having *slight problems* with (1) carrying out multi-step instructions; and (2) working at reasonable pace/finishing on time.  (*Id.*)  She rated A.M.D. as having a *serious problem* with completing class/homework assignments.  (*Id.*)  Ms. Pahls qualified the one serious rating, however, by commenting that "[A.M.D.] completes assignments in class but does not complete homework." (*Id.*)

##### (2)  Interacting and Relating With Others

---

[3] Ms. Pahls completed the questionnaires as to all six domains, but the Court will only highlight herein her assessments in the domains at issue.  Plaintiff argues that there is not substantial evidence for the ALJ's finding that A.M.D. has a less than marked limitation in the areas of attending and completing tasks, interacting and relating with others, and health and physical well-being.  (Doc. 21 at 5.)

In the area of interacting and relating with others, Ms. Pahls rated A.M.D. as having *no problems* with (1) playing cooperatively with children; (2) making and keeping friends; (3) seeking attention appropriately; (4) expressing anger appropriately; (5) asking permission appropriately; (6) following rules (classroom, games, sports); (7) respecting/obeying adults in authority; (8) relating experiences and telling stories; (9) using language appropriate to the situation and listener; (10) introducing and maintaining relevant and appropriate topics of conversation; (11) taking turns in a conversation; and (12) interpreting meaning of facial expression, body language, hints, and sarcasm. (Tr. 222.) Mr. Pahls rated A.M.D. as having *slight problems* with using adequate vocabulary and grammar to express thoughts/ideas in general, everyday conversation. (*Id.*) Ms. Pahls commented that "[A.M.D.] can be a little bossy toward others in class if other students are not doing what they are supposed to do." (*Id.*)

### (3)     Health and Physical Well-Being

In the area of health and physical well-being, Ms. Pahls only noted that A.M.D. wears glasses and that A.M.D. does not frequently miss school due to illness. (Tr. 225.)

### b.     March 16, 2015 Teacher Questionnaire

### (1)     Attending and Completing Tasks

In the area of attending and completing tasks, Ms. Pahls rated A.M.D. as having *no problems* in the areas of (1) paying attention when spoken to directly; (2) sustaining attention during play/sports activities; (3) focusing long enough to finish assigned activity or task; (4) refocusing to task when necessary; (5) carrying out single-step instructions; (6) waiting to take turns; (7) changing from one activity to another without being disruptive; (8) organizing own things or school materials; and (9) completing work accurately without careless mistakes. (Tr. 250.) She rated A.M.D. as having *slights problems* with (1) carrying out multi-step instructions;

(2) working without distracting self or others; and (3) working at reasonable pace/finishing on time. (*Id.*) She rated A.M.D. as having an obvious problem with completing class/homework assignments. (*Id.*) Ms. Pahls commented that "[A.M.D.] did do better with 1-step directions. She could complete class assignments but not homework assignments. In class discussions, she would become "bossy" at times, becoming angry if others were not listening to the teacher, and she would interject herself into the teacher's role, try to tell classmates how to act, etc." (*Id.*)

### (2)      Interacting and Relating With Others

In the area of interacting and relating with others, Ms. Pahls rated A.M.D. as having *no problems.* (Tr. 251.)

### (3)      Health and Physical Well-Being

In the area of health and physical well-being, Ms. Pahls noted that A.M.D. wears glasses and that A.M.D. does not frequently miss school due to illness. (Tr. 254.) Ms. Pahls commented that "[A.M.D.] had diagnoses of ADHD, combined presentation, Hoarding Disorder with excessive acquisition, ODD[.] All this surprised us because we did not see evidence of these things at school." Ms. Pahls further commented that "[p]arents articulated many negative thoughts about [A.M.D.] at IEP meeting. Their perceptions and reported experience of [A.M.D.] did not match the school's experience." (Tr. 255.)

### 4.      University of New Mexico Behavioral Health

On April 2, 2015, [A.M.D.] presented for psychiatric evaluation at the University of New Mexico Behavioral Health Department. (Tr. 472-75.) Plaintiff provided A.M.D.'s relevant history and reported that A.M.D. had been diagnosed with ADHD and ODD. (*Id.*) On mental status exam, Christopher J. Miller, M.D., noted that A.M.D. was appropriately dressed, had good grooming and hygiene, was somewhat reserved but gradually became more talkative and

cooperative, had normal speech, a good mood, euthymic affect, organized, linear and goal-directed thought process, rational thought content, adequate memory and concentration, and poor insight and judgment. (Tr. 474.) Dr. Miller indicated Axis I diagnoses of ADHD, combined type, oppositional defiant disorder, and anxiety disorder, NOS. (*Id.*) He assessed that A.M.D. clearly met the "diagnostic criteria for ADHD and (to a lesser extent) ODD." (Tr. 475.) He further explained that A.M.D.'s hoarding behavior was more difficult to interpret because "it does not (by patient report) appear to be motivated by intrusive thoughts and because she denies experiencing anxiety symptoms when she is not able to keep things. In addition, there is disagreement between the patient and her mother as to the nature and extent of the things she collects, and the patient offers rational explanations about her reasons for wanting to keep food and rocks." (Tr. 475.) Dr. Miller prescribed Concerta and referred A.M.D. for psychotherapy.[4] (*Id.*)

A.M.D. returned five times for psychopharmacological management from May 14, 2015, through May 4, 2016. (Tr. 465-72, 485-89.) Plaintiff and A.M.D. reported considerable improvement in A.M.D.'s behavior and ability to maintain attention after she started Concerta. (Tr. 465, 467-68, 470, 485-87. 488-89.) Plaintiff also reported that A.M.D. was no longer collecting bottles or hiding food in her room. (Tr. 468, 470.) On May 14, 2015, Dr. Miller prescribed Fluoxetine to address A.M.D.'s reported anxiety symptoms.[5] (Tr. 470-72.) A.M.D. subsequently reported that her anxiety was improved with Fluoxetine. (Tr. 467, 469, 487, 490.) On May 4, 2016, A.M.D. reported, *inter alia,* good focus and better grades at school, a happy

---

[4] On July 28, 2015, A.M.D. began psychotherapy. (Tr. 464-65.) A.M.D. attended five psychotherapy sessions from July 28, 2015, through January 12, 2016. (Tr. 460-65, 490-92.) On January 2, and January 12, 2016, A.M.D. reported positive feelings about her school performance and friendships. (Tr. 460, 491.) Her therapist noted that A.M.D. presented as more regulated and reported fewer symptoms of anxiety or mood dysregulation, and that A.M.D. was able to demonstrate insight regarding unhealthy relationships. (Tr. 461, 491.)

[5] A.M.D. reported experiencing anxiety at school when she was called on in class and talking in front of the class. (Tr. 470.)

mood, and that she had no complaints regarding her medications and had no desire for any changes. (Tr. 485-86.)

### 5.    State Agency Opinions

#### a.    John Giblin, M.D.

On January 20, 2015, nonexamining State agency medical consultant John Gilblin, M.D., reviewed the medical record evidence at the initial level of review and assessed that A.M.D. had a marked limitation in the area of acquiring and using information; a less than marked limitation in the areas of attending and completing tasks, and interacting and relating with others; and no limitation in the areas of moving about and manipulation of objects, caring for yourself, and health and physical well-being.  (Tr. 73-78.)

#### b.    Donald Gucker, Ph.D.

On May 13, 2015, nonexamining State agency psychological consultant Donald Gucker, Ph.D., reviewed the medical record evidence at reconsideration and assessed that A.M.D. had a marked limitation in the area of acquiring and using information; a less than marked limitation in the areas of attending and completing tasks, interacting and relating with others, and caring for yourself; and no limitation in the area of moving about and manipulations of objects and health and physical well-being.  (Tr. 88-92.)

#### c.    John P. Owen, Ph.D.

On April 23, 2015, examining State agency psychological consultant John P. Owen, Ph.D., performed a mental status examination of A.M.D., that included the administration of the Mini-Mental State Examination.  (Tr. 410-12.)  Plaintiff reported A.M.D.'s diagnoses of ADHD, specific learning disorder with impairment in reading and math, hoarding disorder, and oppositional defiant disorder.  (Tr. 410.)  Plaintiff stated that A.M.D. was exceptionally defiant at

home.  (*Id.*)  Plaintiff also stated she viewed A.M.D. as depressed and anxious.  (*Id.*)  On mental status exam, Dr. Owen observed that A.M.D. was neatly groomed and attired, cooperative, understood simple questions and instructions, had clear and coherent speech, appropriate affect, no extreme mood swings, oriented to time, place and person, and average mental ability.  (Tr. 411.)  Dr. Owen noted that A.M.D. scored 29 out of a maximum 30 points on the Mini-Mental Status Examination.  (*Id.*)  Dr. Owen diagnosed ADHD, combined type; hoarding disorder, provisional; oppositional defiant disorder, provisional; math disorder, provisional; and reading disorder, provisional.  (*Id.*)  Dr. Owen summarized that

> [A.M.D.'s] mother sees her daughter as accurately diagnosed with hoarding disorder and oppositional defiant disorder.  In addition, she takes Concerta for ADHD which has helped considerably.  [A.M.D.] has been at Wilson Middle School for approximately two years, and her mother has not received any negative reports from the school.

(Tr. 411.)  Except for moderate difficulties in her ability to understand and remember detailed or complex instructions, Dr. Owen assessed that A.M.D. had either mild or no difficulties in all other areas of her abilities in specified mental activities.  (*Id.*)

### B.    The ALJ's Findings Regarding A.M.D.'s Limitations Are Supported by Substantial Evidence

#### 1.    Attending and Completing Tasks

At the third step of the analysis, the ALJ found that A.M.D. had a less than marked limitation in the domain of attending and completing tasks.  (Tr. 23-24.)  Plaintiff argues that the ALJ's finding is contrary to substantial evidence, and contrary to law because the ALJ did not state what weight he gave Dr. Vaughan's findings, or offer valid reasons to discount the testing itself.  (Doc. 21 at 7.)  In support, Plaintiff cites to (a) Ms. Pahls' January 15, 2015, Teacher Questionnaire in which she indicated that A.M.D. had a serious problem with completing class/homework assignments, (b) certain portions of Dr. Vaughan's neuropsychological test results she claims

"overwhelmingly indicate a marked limitation in this domain," and (c) portions of the record that reported A.M.D. talks too much and has problems with distraction. (*Id.* at 7-8.)

The Commissioner contends that the record supports the ALJ's determination that A.M.D. had a less than marked limitation in the domain of attending and completing tasks. (Doc. 23 at 7-8.) The Commissioner asserts that the ALJ correctly observed that A.M.D.'s teacher found only one serious problem in this domain, while indicating that she had no problems in the 12 other activities listed. (*Id.*) The Commissioner further asserts that despite Dr. Vaughan's behavioral observations of A.M.D. during the test taking, the ALJ accurately noted Dr. Vaughan's conclusion that A.M.D.'s test performance suggested "attentional difficulties and executive dysfunction characterized by *mild difficulties* with sustained attention and impulsivity." (*Id.*) As such, the Commissioner contends that the ALJ did not reject Dr. Vaughan's opinion relevant to this domain, but clearly considered this opinion and relied on it to find A.M.D. had a less than marked limitation. (*Id.*) Finally, the Commissioner contends that Plaintiff's claims that the ALJ should have found a marked limitation in this domain amounts to asking the Court to re-weigh the evidence. (*Id.*)

The functional domain of "attending and completing tasks" considers how well a child is able to focus and maintain attention, and how well she begins, carries through, and finishes activities, including the pace at which she performs activities and the ease with which she changes them. 20 C.F.R. § 416.926a(h).

> Attention involves regulating your levels of alertness and initiating and maintaining concentration. It involves the ability to filter out distractions and to remain focused on an activity or task at a consistent level of performance. This means focusing long enough to initiate and complete an activity or task, and changing focus once it is completed. It also means that if you lose or change your focus in the middle of a task, you are able to return to the task without other people having to remind you frequently to finish it.

20 C.F.R. § 416.926a(h)(1)(i).  The regulations provide the following age descriptor for this domain:

> When you are of school age, you should be able to focus your attention in a variety of situations in order to follow directions, remember and organize your school materials, and complete classroom and homework assignments.  You should be able to concentrate on details and not make careless mistakes in your work (beyond what would be expected in other children your age who do not have impairments). You should be able to change your activities or routines without distracting yourself or others, and stay on task and in place when appropriate.  You should be able to sustain your attention well enough to participate in group sports, read by yourself, and complete family chores.  You should also be able to complete a transition task (*e.g.,* be ready for the school bus, change clothes after gym, change classrooms) without extra reminders and accommodation.

20 C.F.R. § 416.926a(h)(2)(iv).  Examples of limited functioning in attending and completing tasks include:

> (i)     You are easily startled, distracted, or overreactive to sounds, sights, movements, or touch.
>
> (ii)    You are slow to focus on, or fail to complete activities of interest to you, *e.g,* games or art projects.
>
> (iii)   You repeatedly become sidetracked from your activities or you frequently interrupt others.
>
> (iv)    You are easily frustrated and give up on tasks, including ones you are capable of completing.
>
> (v)     You require extra supervision to keep you engaged in an activity.

20 C.F.R. § 416.926a(h)(3)(i)-(v).

The Court finds that the ALJ properly considered all of the evidence and regulatory standards in finding that A.M.D. has a less than marked limitation in attending and completing tasks, and that his finding is supported by substantial evidence.  *See* 20 C.F.R. § 416.924a; 20 C.F.R. § 416.926a.  In support of his finding, the ALJ considered the medical source evidence and discussed Dr. Vaughan's report, including the noted parent complaints, the examiner's

observations, and the objective test results. (Tr. 23-24.) The ALJ noted verbatim Dr. Vaughan's finding related to A.M.D.'s test results in the area of "attention, processing speed and executive functions," that is, "[o]verall, [A.M.D.'s] performance suggested attentional difficulties and executive dysfunction characterized by *mild difficulties* with sustained attention and impulsivity." (Tr. 24.) (Emphasis added.) The ALJ discussed Dr. Owen's consultative report in which he noted that Plaintiff reported considerable improvement with A.M.D.'s attention and concentration since starting Concerta, that A.M.D. was much more focused on tasks in terms of getting ready for and going to school, and that she had not received any negative reports from A.M.D.'s school for approximately two years. (Tr. 17.) The ALJ also discussed the nonexamining State agency opinion evidence which supports his finding that A.M.D. has a less than marked limitation in this domain. (Tr. 20, 74, 88.) The ALJ discussed A.M.D.'s behavioral health provider and therapy treatment notes wherein A.M.D. reported she could "focus better" and that her teachers observed she was "significantly" less disruptive in class and maintaining attention since starting Concerta. (Tr. 18.) And the ALJ discussed A.M.D.'s reports to her behavioral health providers that she was happy, had friends, and was doing well with her school work. (*Id.*) The record supports all of these findings. (Tr. 354, 410-412); *See* Section III.A.4., *supra.*

The ALJ also considered the nonmedical record evidence in making his finding. The ALJ discussed A.M.D.'s IEP evaluations in which her teachers reported, *inter alia*, that A.M.D. was bright, kind, hardworking, respectful, never disruptive or distracting, focused, and consistently turned in completed work without the need of extended deadlines. (Tr. 18.) The ALJ discussed Ms. Pahls' completed Teachers' Questionnaires regarding A.M.D.'s behavior and progress at school, both of which indicated only one problem in the area of completing homework assignments. (Tr. 20.) The ALJ discussed Plaintiff's and A.M.D.'s testimony. (Tr. 24.) He noted

that on the one hand Plaintiff testified that at home A.M.D. continues to talk back to her, throws fits, breaks dishes, hoards, fidgets, isolates herself, and does not have friends, while on the other hand she testified that since starting medication A.M.D. was doing a lot better, that A.M.D. was involved in ROTC and learning discipline at school, that A.M.D. was passing all of her classes, and that A.M.D. may have friends at school that she does not know about.[6]  (Tr. 19.)  The ALJ also discussed in detail A.M.D.'s testimony related to her improvements and successes at school and at home.  (*Id.*)  The ALJ noted that A.M.D. appeared very calm and well-adjusted when answering his questions at the Administrative Hearing.  (*Id.*)  The record supports all of these findings.  *See* Section III.A.2. and A.3., *supra.*

The ALJ demonstrated he considered all the evidence as he was required to do, and his finding in the domain of attending and completing tasks is supported by substantial evidence. *Clifton,* 79 F.3d at 1009-10.  The Court has exhaustively reviewed and considered the entire record, and is unable, without improperly reweighing the evidence, to conclude that certain isolated findings and comments support a marked limitation in this domain.  *See Oldham,* 509 F.3d at 1257-58.  Because the Court finds that the ALJ's finding is supported by substantial evidence, and because Plaintiff's argument goes to the weight of the evidence and not its sufficiency, the Court will not displace the ALJ's decision.

The Court further finds that Plaintiff's argument that the ALJ erred by failing to weigh Dr. Vaughan's findings or offer valid reasons to discount the testing itself is without merit.  (Doc. 21 at 7.)  Dr. Vaughan's report contains results and her interpretation of results based on the standardized tests she administered, along with her summary of the information Plaintiff and

---

[6] The ALJ determined that Plaintiff's testimony regarding the severity of A.M.D.'s symptoms was outweighed by other factors, including Plaintiff's contradictory testimony, the medical source evidence, and school reports reflecting A.M.D.'s significant progress.  (Tr. 19.)

A.M.D. provided in the behavioral rating forms they completed. (Tr. 349-68.) Her report also contained diagnoses and recommendations based on the test results and the information provided; *i.e.,* that A.M.D. receive special education services, seek a neurology consult for potential sleep disorder and/or seizure activity, participate in counseling to address her emotional and behavioral difficulties, and consult with a child psychiatrist to determine whether psychopharmacological intervention would be helpful. (Tr. 356-59.) Although Dr. Vaughan's report was not per se medical "opinion" evidence regarding the six domains of functioning,[7] even assuming *arguendo* that Dr. Vaughan provided medical opinion evidence specifically related to A.M.D.'s ability to attend and complete tasks, the ALJ's failure to explicitly weigh that opinion is harmless error because there is no inconsistency between the opinion and the ALJ's finding. *See generally Mays v. Colvin*, 739 F.3d 569, 578 (10th Cir. 2014) (quoting *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1162-63 (10th Cir. 2012) (explaining that an ALJ's failure to weigh a medical opinion is harmless error if there is no inconsistency between the opinion and the ALJ's assessment of residual functional capacity "because giving greater weight to [the opinion] would not have helped her."). As previously noted, the ALJ discussed in detail Dr. Vaughan's neuropsychological evaluation. (Tr. 16-17, 21-22, 23-24, 25-26.) And while it is true that Dr. Vaughan observed "difficulties with sustained attention and distractibility . . . throughout the day," noted that A.M.D. "needed reminders to stay on task," and that her performance on testing in the areas of "Attention, Processing Speed and Executive Functions" were variable, "which in and of itself is indicative of a problem regulating attention," (Tr. 353-54), the overall results "suggested attentional difficulties and executive dysfunction *characterized by mild difficulties with sustained attention and*

---

[7] *See* 20 C.F.R. § 416.913(a)(2) (explaining that a medical opinion [for a child's claim] is a statement from a medical source about what you can still do despite your impairment(s) and whether you have one or more impairment-related limitations or restrictions in the six domains of functioning).

*impulsivity.*" (Tr. 353-54 emphasis added.) These overall results are not inconsistent with the ALJ's determination that A.M.D. had a less than marked limitation in attending and completing tasks. 20 C.F.R. § 416.926a(e) (A marked limitation is "more than moderate.") The ALJ's finding in this domain is supported by substantial evidence, and an error in the ALJ's treatment of Dr. Vaughan's opinion, if any, is harmless.

For all of the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, considered the regulatory standards for assessing A.M.D.'s functioning in attending and completing tasks, and made findings that are supported by substantial evidence. There is no reversible error as to this issue.

## 2. Interacting and Relating With Others

At the third step of the analysis, the ALJ found that A.M.D. had a less than marked limitation in the domain of interacting and relating with others. (Tr. 25-26.) Plaintiff argues that the ALJ engaged in picking and choosing from teacher comments and ignored evidence that is favorable to A.M.D.'s disability claim. (Doc. 21 at 10-12.) Plaintiff specifically cites to her reports to healthcare providers regarding A.M.D.'s behavioral problems that included stealing, challenging her authority, lying, fighting, bullying, and A.M.D.'s inability to make friends. (*Id.*) Plaintiff also cites to school reports wherein A.M.D. was described as bossy and that she required ongoing social work services because of challenging peer interactions. (*Id.*)

The Commissioner contends that the record as a whole supports the ALJ's determination that A.M.D. has a less than marked limitation in this domain. (Doc. 23 at 9-10.) Specifically, the ALJ considered observations in the record related to A.M.D.'s behavioral problems, but also considered that A.M.D.'s symptoms improved with medication, that her teacher observations

demonstrated significant improvement over time, and that the medical opinion evidence supported the ALJ's finding. (*Id.*)

The functional domain of "interacting and relating with others" considers how well a child initiates and sustains emotional connections with others, develops and uses the language of her community, cooperates with others, complies with rules, responds to criticism, and respects and takes cares of the possessions of others. 20 C.F.R. § 416.926a(i).

> Interacting means initiating and responding to exchanges with other people, for practical or social purposes. . . . Relating to other people means forming intimate relationships with family members and with friends who are your age, and sustaining them over time. . . . Interacting and relating require you to respond appropriately to a variety of emotional and behavioral cues. You must be able to speak intelligibly and fluently so that others can understand you; participate in verbal turn taking and nonverbal exchanges; consider others' feelings and points of view; follow social rules for interaction and conversation; and respond to others appropriately and meaningfully.

20 C.F.R. § 416.926a(i)(1)(i)-(iii). The regulations provide the following age descriptor for this domain:

> When you enter school, you should be able to develop more lasting friendships with children who are your age. You should begin to understand how to work in groups to create projects and solve problems. You should have an increasing ability to understand another's point of view and to tolerate differences. You should be well able to talk to people of all ages, to share ideas, tell stories, and to speak in a manner that both familiar and unfamiliar listeners readily understand.

20 C.F.R. § 416.926a(i)(2)(iv). Examples of limited functioning in interacting and relating with others include:

> (i)     You do not reach out to be picked up and held by your caregiver.
>
> (ii)    You have no close friends, or your friends are all older or younger than you.
>
> (iii)   You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
>
> (iv)    You have difficulty playing games or sports with rules.

(v)     You have difficulty communicating with others; *e.g.,* in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.

(vi)    You have difficulty speaking intelligibly or with adequate fluency.

20 C.F.R. § 416.926a(i)(3)(i)-(vi).

The Court finds that the ALJ properly considered all of the evidence and regulatory standards in finding that A.M.D. has a less than marked limitation in interacting and relating with others. *See* 20 C.F.R. § 416.924a; 20 C.F.R. § 416.926a. In support of his finding, which the Court finds is supported by substantial evidence, the ALJ discussed teacher observations that noted A.M.D.'s slight problem with using adequate vocabulary and grammar to express her thoughts and ideas, and that A.M.D. would become "bossy" at times with her classmates if they were not listening to the teacher. (Tr. 25.) The ALJ further discussed Dr. Vaughan's summary of the rating forms Plaintiff and A.M.D. completed, and noted that Plaintiff's responses were significantly elevated in every area indicating that A.M.D. functioned below her peers in social and communication skills, had significant elevations of depression with functional and emotional problems, had high levels of anxiety, and had significant difficulties with, *inter alia*, oppositional behaviors, including conduct problems, defiance, and aggression.[8] (Tr. 25-26.) The ALJ also discussed Dr. Owen's consultative exam observations that A.M.D. was cooperative and had an appropriate affect without extreme mood swings, and that Plaintiff and A.M.D. reported A.M.D. was having good results with medication. (Tr. 26.) The ALJ discussed that A.M.D. was benefitting from social work services to help her maintain positive behaviors in the school setting. (*Id.*) Finally, the ALJ discussed various teacher observations as reported on A.M.D.'s IEP evaluations that described A.M.D. as "'very smart,' an 'awesome' student, bright, very kind, quiet,

---

[8] The ALJ noted that A.M.D.'s responses were in stark contrast to Plaintiff's. (Tr. 25-26.)

hardworking, positive, interested student, and a 'people pleaser.'  Likewise, she was 'always'

respectful and a good role model to other students and chosen as 'Student of the Month' in

February 2016." (Tr. 26.)  The record supports these findings.  *See* Section III.A.2., *supra.*[9]  Thus,

contrary to Plaintiff's argument, the ALJ demonstrated that he considered all of the evidence,

including the evidence Plaintiff argues supports a marked limitation in this domain.  *Clifton,* 79

F.3d at 1009-10.

Because the ALJ considered and discussed the evidence for childhood disability as

required, considered the regulatory standards for assessing A.M.D.'s functioning in interacting and

relating with others, and made findings that are supported by substantial evidence, there is no

reversible error as to this issue.

### 3.     Health and Physical Well-Being

At the third step of the analysis, the ALJ found that A.M.D. had no limitation in the domain

of health and physical well-being. (Tr. 29.)  Plaintiff argues that the ALJ failed to properly consider

the medical record evidence of  A.M.D.'s mental health history of depression and anxiety.  (Doc.

13-17.)  The Commissioner contends that the ALJ reasonably found A.M.D. had no limitation in

health and physical well-being.  (Doc. 23 at 11-12.)  The Commissioner asserts that this domain

considers the "cumulative *physical* effects" of physical or mental impairments, and that the record

here fails to demonstrate any physical effects resulting from A.M.D.'s alleged mental impairments.

(*Id.*)

---

[9]  The record further demonstrates that A.M.D.'s special education program manager, Ms. Pahls, found that A.M.D. had no problems with interacting and relating with others (Tr. 251), that her general education teachers observed she was very social and outgoing and interacted positively with other children (Tr. 261), and that A.M.D. reported to her behavioral healthcare providers that she had friends at school and had positive feelings about her friendships (Tr. 460, 465.)

The functional domain of "health and physical well-being" considers the cumulative physical effects of physical or mental impairments and their associated treatments or therapies on functioning. 20 C.F.R. § 926a(l).

    (1)    A physical or mental disorder may have physical effects that vary in kind and intensity, and may make it difficult for you to perform your activities independently or effectively. You may experience problems such as generalized weakness, dizziness, shortness of breath, reduced stamina, fatigue, psychomotor retardation, allergic reactions, recurrent infection, poor growth, bladder or bowel incontinence, or local or generalized pain.

    (2)    In addition, the medications you take (*e.g.,* for asthma or depression) or the treatments you receive (*e.g.,* chemotherapy or multiple surgeries) may have physical effects that also limit your performance of activities.

    (3)    Your illness may be chronic with stable symptoms, or episodic with periods of worsening and improvement. We will consider how you function during periods of worsening and how often and for how long these periods occur. You may be medically fragile and need intensive medical care to maintain your level of health and physical well-being. In any case, as a result of the illness itself, the medications or treatment you receive, or both, you may experience physical effects that interfere with your functioning in any or all of your activities.

20 C.F.R. § 926a(l)(1)-(3). Examples of limitations in health and physical well-being include:

    (i)    You have generalized symptoms, such as weakness, dizziness, agitation (*e.g.,* excitability), lethargy (*e.g.,* fatigue or loss of energy or stamina), or psychomotor retardation because of your impairment(s).

    (ii)    You have somatic complaints related to your impairments (*e.g.,* seizure or convulsive activity, headaches, incontinence, recurrent infections, allergies, changes in weight or eating habits, stomach discomfort, nausea, headaches, or insomnia).

    (iii)    You have limitations in your physical functioning because of your treatment (*e.g.,* chemotherapy, multiple surgeries, chelation, pulmonary cleansing, or nebulizer treatments).

    (iv)    You have exacerbations from one impairment or a combination of impairments that interfere with your physical functioning.

    (v)    You are medically fragile and need intensive medical care to maintain your level of health and physical well-being.

20 C.F.R. § 926a(l)(4)(i)-(v).

The Court finds that the ALJ properly considered all of the evidence and regulatory standards in finding that A.M.D. has no limitation in her health and well-being, and that his finding is supported by substantial evidence. *See* 20 C.F.R. § 416.924a; 20 C.F.R. § 416.926a. In support of his finding, the ALJ stated as follows:

> The longitudinal medical evidence from her primary care physician indicated multiple throat infections, seasonal allergies, and insomnia (Exhibits 1F, 2F, 4F, 8F, and 9F). However, no chronic function limiting illnesses were noted. She is prescribed medications for diagnoses of ADHD and ODD that have been generally effective in controlling her symptoms (as previously mentioned). No significant side effects from her medications have been noted other than "mild" sedation from Prozac (Exhibit 9F). Nonetheless, at most office visits, she was alert and fully oriented (Exhibits 1F, 2F, 4F, 8F, and 9F.)

(Tr. 29.) The record further demonstrates that A.M.D. had no unusual absenteeism and did not frequently miss school due to illness, she did well in physical education, and she routinely participates in drill, step and marching exercises as part of her ROTC leadership program. (Tr. 46-47, 225, 248, 254, 261.) Further, none of the medical source record evidence demonstrates any physical limitations based on A.M.D.'s alleged mental impairments.[10]

For the foregoing reasons, the Court finds that the ALJ considered and discussed the evidence for childhood disability as required, considered the regulatory standards for assessing A.M.D.'s functioning in health and physical well being, and made findings that are supported by substantial evidence. As such, there is no reversible error as to this issue.

### C. The ALJ Did Not Err in His Credibility Findings and Assessment of Ms. Duran's Testimony.

---

[10] At step two, the ALJ did not find that A.M.D. had severe impairments of either anxiety or depression. Plaintiff has not disputed this finding. Moreover, the record demonstrates that A.M.D. responded well to Fluoxetine for her reported anxiety symptoms, and there is no objective record evidence that A.M.D. was treated for depression.

Plaintiff argues that the ALJ improperly assessed the credibility of her testimony and failed to provide a "link to specific evidence that belies [her] account of A.M.D.'s limitations." (Doc. 21 at 18-19.) The Commissioner contends, and the Court agrees, that the ALJ set forth evidence demonstrating that A.M.D.'s limitations were not as severe as Plaintiff alleged. (Doc. 23 at 13.). When a child is unable to adequately describe her symptoms, the regulations permit testimony concerning her symptoms by the person most familiar with the child, such as a parent. *Bledsoe ex rel. J.D.B. v. Colvin*, 544 Fed.Appx. 823 (2013), 20 C.F.R. § 416.928(a). "In such a case, the ALJ must make specific findings concerning the credibility of the parent's testimony. . .." *Briggs ex rel. Briggs v. Massanari*, 248 F.3d 1235, 1239 (10th Cir. 2001). "Credibility determinations are peculiarly the province of the finder of fact, and [the Court] will not upset such determinations when supported by substantial evidence" in the record, provided the determinations are "closely and affirmatively linked to [that] evidence." *Cowan v. Astrue*, 552 F.3d 1182, 1190 (10th Cir. 2008) (internal quotation marks omitted).

The regulations also contemplate the use of information from "other sources," including non-medical source caregivers and parents[11], to show the severity of a child's impairments and how it affects the child's ability to function. *Frantz v. Astrue*, 509 F.3d 1299, 1301 (10th Cir. 2007) (citing 20 C.F.R. § 416.902); see SSR 06-03p, 2006 WL 2329939, at *2.[12] However "[i]nformation from these 'other sources' cannot establish the existence of a medically

---

[11] For claims filed before March 27, 2017, non-medical sources include, but are not limited to, educational personnel, such as school teachers, counselors, early intervention team members, developmental center workers, and daycare center workers; public and private social welfare agency personnel, rehabilitation counselors; and spouses, parents and other caregivers, siblings, other relatives, friends, neighbors, clergy and employers. SSR 06-03p, 2006 WL 2329939, at *2; SSR 96-2p, 2017 WL 3928298.

[12] SSR 06-3 is rescinded for claims filed on or after March 27, 2017. SSR 96-2p, 2017 WL 3928298, at *1.

determinable impairment. Instead there must be evidence from an 'acceptable medical source'[13] for this purpose." SSR 06-03p, 2006 WL 2329939, at *2. An ALJ is required to explain the weight given to opinions of non-medical sources who have seen a claimant in their professional capacity, "or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6; *see also Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1163 (10th Cir. 2012) (finding that ALJ was required to explain the amount of weight given to other medical source opinion or sufficiently permit reviewer to follow adjudicator's reasoning). The weight given to this evidence will vary according to the particular facts of the case, the source of the opinion, the source's qualifications, the issues that the opinion is about, and other factors, *i.e.* how long the source has known and how frequently the source has seen the individual; how consistent the opinion is with other evidence; the degree to which the source presents relevant evidence to support an opinion; how well the source explains the opinion; whether the source has a specialty or area of expertise related to the individual's impairment; and any other facts that tend to support or refute the opinion. SSR 06-03p, 2006 WL 2329939, at *4-5.

Both Plaintiff and A.M.D., age 13 and in 8th grade at the time (Tr. 45), testified at the hearing. The ALJ evaluated Plaintiff's statements in the record and testimony in accordance with SSR 06-3p, and afforded limited weight to her hearing testimony. (Tr. 19.) The ALJ explained that portions of Plaintiff's testimony was outweighed by her own contradictory testimony, by A.M.D.'s testimony, and by the medical source evidence and school reports reflecting A.M.D.'s significant progress. (Tr. 19) The ALJ properly considered Plaintiff's testimony and provided

---

[13] For claims filed before March 27, 2017, "acceptable medical sources" are licensed physicians, licensed or certified psychologists, licensed optometrists, licensed podiatrists, and qualified speech-language pathologists. SSR 06-03p, 2006 WL 2329939, at *1; SSR 96-2p, 2017 WL 3928298.

legitimate explanations affirmatively linked to substantial evidence in the record for the weight accorded to it. The Court has scrutinized the record in its entirety and finds no basis to upset the ALJ's findings. There is no reversible error as to this issue.

> ### D. The ALJ Properly Applied the Regulatory Standards in Assessing A.M.D.'s Functional Equivalence

Plaintiff argues that the ALJ failed to compare A.M.D. to non-disabled children and failed to properly consider that A.M.D. received special accommodations not available to other children in the classroom, and required medication to prevent her from being disruptive. (Doc. 21 at 17-18.) The Commissioner contends that the ALJ properly considered A.M.D.'s special accommodations when comparing her to other children. (Doc. 23 at 12-13.)

SSR 09-01p states in pertinent part that

> [w]e always evaluate the "whole child" when we make a finding regarding functional equivalence, unless we can make a fully favorable determination or decision without having to do so. The functional equivalence rules require us to begin by considering how the child functions every day and in all settings compared to other children the same age who do not have impairments.

SSR 09-1p, 2009 WL 396031, at *2. Here, the ALJ stated that

> [a]s provided in 20 CFR 416.926a(b) and (c) and explained in 09-1p, the undersigned has evaluated the "whole child" in making findings regarding functional equivalence. The undersigned has first evaluated how the child functions in all settings and at all times, as compared to other children the same age who do not have impairments. The undersigned has also assessed the interactive and cumulative effects of all of the claimant's medically determinable impairment(s), including any impairments that are not "severe" in all of the affected domains. In evaluating the claimant's limitations, the undersigned has considered the type, extent, and frequency of help the claimant needs to function.

(Tr. 15.) Where, as here, the ALJ explicitly indicated he considered all the evidence in accordance with the applicable regulatory standards, the Court's practice is to take the ALJ "at [his] word." *Flaherty v. Astrue,* 515 F.3d 1067, 1071 (10th Cir. 2007) (citing *Hackett v. Barnhart*, 395 F.3d 1168, 1173 (10th Cir. 2005)). Having already found that the ALJ's discussion of the evidence and

the reasons for his conclusions are supported by substantial evidence, the Court has every reason to abide by this well-established principle here. The Court finds that the ALJ considered and discussed the evidence for childhood disability as required, and properly applied the regulatory standards in assessing A.M.D.'s functional equivalence in the domains at issue. For these reasons, there is no reversible error as to this issue.

## IV. Conclusion

Plaintiff's Motion to Reverse and Remand for Payment of Benefits, or in the Alternative, for Rehearing, With Supporting Memorandum (Doc. 21) is **DENIED.**

**KIRTAN KHALSA**
**United States Magistrate Judge,**
**Presiding by Consent**